# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BOUMEDIENE, ) | |
| Petitioner, ) | |
| v. ) | Civil Action No. 04-cv-1166 (RJL) |
| GEORGE W. BUSH, ) | |
| President of the United States, ) | |
| et al., ) | |
| Respondents ) | |
| _____ ) | |
| ) | |
| SLITI, ) | |
| Petitioner, ) | |
| v. ) | Civil Action No. 05-cv-0429 (RJL) |
| GEORGE W. BUSH, ) | |
| President of the United States, ) | |
| et al., ) | |
| Respondents ) | |
| _____ ) | |
| ) | |
| KABIR, ) | |
| Petitioner, ) | |
| v. ) | Civil Action No. 05-cv-0431 (RJL) |
| GEORGE W. BUSH, ) | |
| President of the United States, ) | |
| et al., ) | |
| Respondents ) | |
| _____ ) | |
| ) | |
| MAMMAR, ) | |
| Petitioner, ) | |
| v. ) | Civil Action No. 05-cv-0573 (RJL) |
| GEORGE W. BUSH, ) | |
| President of the United States, ) | |
| et al., ) | |
| Respondents ) | |
| _____ ) | |
| ) | |
| AL KAHAIY, ) | |
| Petitioner, ) | |
| v. ) | Civil Action No. 05-cv-1239 (RJL) |
| GEORGE W. BUSH, ) | |
| President of the United States, ) | |
| et al., ) | |

|  |  |  |
|---|---|---|
| Respondents | ) | |
| _____ | ) | |
| | ) | |
| AL GINCO, | ) | |
|     Petitioner, | ) | |
|     v. | ) | Civil Action No. 05-cv-1310 (RJL) |
| GEORGE W. BUSH, | ) | |
|     President of the United States, | ) | |
|     et al., | ) | |
|     Respondents | ) | |
| _____ | ) | |
| | ) | |
| AL BIHANI, | ) | |
|     Petitioner, | ) | |
|     v. | ) | Civil Action No. 05-cv-1312 (RJL) |
| GEORGE W. BUSH, | ) | |
|     President of the United States, | ) | |
|     et al., | ) | |
|     Respondents | ) | |
| _____ | ) | |
| | ) | |
| GHAZY, | ) | |
|     Petitioner, | ) | |
|     v. | ) | Civil Action No. 05-cv-2223 (RJL) |
| GEORGE W. BUSH, | ) | |
|     President of the United States, | ) | |
|     et al., | ) | |
|     Respondents | ) | |
| _____ | ) | |
| | ) | |
| RUMI, | ) | |
|     Petitioner, | ) | |
|     v. | ) | Civil Action No. 06-cv-0619 (RJL) |
| GEORGE W. BUSH, | ) | |
|     President of the United States, | ) | |
|     et al., | ) | |
|     Respondents | ) | |
| _____ | ) | |
| | ) | |
| OBAYDULLAH, | ) | |
|     Petitioner, | ) | |
|     v. | ) | Civil Action No. 08-cv-1173 (RJL) |
| GEORGE W. BUSH, | ) | |
|     President of the United States, | ) | |
|     et al., | ) | |
|     Respondents | ) | |

_____ )

**GOVERNMENT'S RESPONSE BRIEF REGARDING PRELIMINARY AND
PROCEDURAL FRAMEWORK ISSUES**

**INTRODUCTION**

Petitioners largely reject the carefully delineated proceedings of the controlling plurality
in *Hamdi* v. *Rumsfeld*, 542 U.S. 507 (2004).  Instead, petitioners envision an expansive quasi-
criminal proceeding to challenge their detention with wide-ranging discovery and a panoply of
procedural rights that are nowhere contemplated by the Supreme Court.  Indeed, the Supreme
Court, both in *Hamdi*, and *Boumediene v. Bush*, 128 S. Ct. 2229 (2008), called for a much more
modest role for the courts in evaluating wartime detention decisions than that proposed by the
petitioners.  Many of petitioners' proposals ignore or directly contradict the framework for these
cases set forward in *Hamdi*, and their proposal for factfinding is anything but "prudent and
incremental."  *Hamdi*, 542 U.S. at 539.  Instead, petitioners' proposals closely resemble the
expansive criminal-type procedures that the *Hamdi* district court had ordered but that the
Supreme Court reversed as overbroad.  The procedures they propose trivialize both the unique
circumstance these habeas cases present – where judges will be evaluating the intelligence and
information that leads to military actions taken overseas during an active military conflict – and
the weighty national security interests that the Supreme Court has repeatedly recognized must be
part of the balance.

This context demands a more circumspect role for this Court—one where, to be sure,
each petitioner and the Court is provided notice of the Government's basis for detention through
the filing of a factual return, but one where:  (i) the Court must giver proper weight to the

Government's military determination to detain an individual as an enemy combatant by, among other things, presuming the correctness of the information relied upon by the Government in making that military decision, even though it will often be hearsay evidence; (ii) the petitioner is entitled to rebut that showing with his *own* factual submission, but not to seek discovery from the Government; and (iii) the Court must then dismiss the petition unless petitioner's showing is more persuasive than the Government's.  Only if a petitioner makes such a more persuasive showing should this Court consider further evidentiary and factfinding proceedings.

Petitioners rely heavily on the habeas statute and urge that the court should not deviate from it, but nowhere address the fact that *Hamdi* required implementation of much narrower procedures when that same habeas statute clearly was applicable.  Now it is not.  Thus, in addition to failing to acknowledge that *Hamdi* provided for narrower procedures in this context where the habeas statute applies, they fail to come to terms with the fact that Congress *repealed* that statute and, accordingly, "now there must be constitutionally based jurisdiction or none at all."  *Boumediene*, 128 S. Ct. at 2278 (Souter, J., concurring).  As we have demonstrated, the *constitutional* requirements for habeas are the applicable rules going forward.  In any event, petitioners interpret the statute far more expansively than is warranted and propose a process exceeding what is provided in the habeas statute and rules.  The habeas statute provides for very limited discovery, at most, and summary resolution of the facts – not a norm of free-wheeling discovery, trial-type hearings, and proof beyond a reasonable doubt.  The habeas statute certainly does not mandate what petitioners demand, but at most allows courts some flexibility in the procedures employed.  It would be improper to use this flexibility as a means of requiring criminal trial-like procedures in light of both *Hamdi*'s rejection of such procedures and

Congress's judgment (reflected in the DTA and the MCA) that there should be no habeas procedures available at all in this context.  Prudent implementation of the habeas statute in this context should be informed by Congress's clear intent for these cases, and thus interpreted to require only the constitutional minimum.  Nor is such prudent implementation foreclosed by *Boumediene*, which stressed that "[t]he extent of the showing required of the Government in these cases remains to be determined."  128 S. Ct. at 2271.

Petitioners' proposed procedures are not only inconsistent with *Hamdi*, but also with the Government's legitimate national security concerns.  For example, petitioners demand that the Government meet the highest possible standard of proof – beyond a reasonable doubt –  to detain an enemy alien even though a much less onerous showing is sufficient to justify even the lethal use of military force abroad.  Moreover, the criminal-like procedures that petitioners propose would, as a matter of course, require military and intelligence officers to appear in person in testimonial hearings.

Aside from being fatally flawed as a legal matter, petitioners' proposed framework would do nothing to provide a workable construct for this Court to handle multiple habeas petitions. Petitioners ignore the fact that these cases are all quite similar – each involves an enemy alien who has been captured outside the United States as part of military operations in a war with al Qaeda, the Taliban, and associated forces; each has been determined by the Executive to be an enemy combatant in that war; and each is detained abroad.  These circumstances warrant even greater deference than *Hamdi*, which involved a citizen detained within the United States and entitled (unlike petitioners here) to all of the rights afforded by the Constitution and by the modern habeas statute and rules.  Thus, *Hamdi* provides the outer bounds for the process

appropriate here.

Procedurally, the way forward is clear.  The path was set out in *Hamdi*, and it calls for a burden-shifting approach and a prudent and incremental response in each of the areas identified by the Court for common resolution.  The Government's proposed framework does just that and gives petitioners their day in Court, without delay.

In addition to adopting the Government's proposed framework, this Court should decline to enter an injunction prohibiting the transfer of a petitioner absent thirty-day advance notice of transfer to the petitioner both because this Court lacks jurisdiction to enter such an order, and because petitioners have failed to satisfy any of the preliminary injunction factors with respect to such an injunctive order.  Finally, it makes practical sense to prioritize cases where the detainee has not been approved for transfer or release because in cases where release or transfer has been approved, the case may become moot and in any event its resolution will be of limited practical significance since the Government is already actively trying to transfer the petitioner out of United States custody.

## I.     PETITIONERS' PROPOSAL REJECTS THE *HAMDI* FRAMEWORK AND CALLS FOR THE QUASI-CRIMINAL PROCESS THAT THE SUPREME COURT REJECTED.

We have explained why this Court should enter an order implementing the *Hamdi* framework.  Govt. Br. at 7-14.  That framework gives the Court what it must have under *Boumediene*: "the means to correct errors," including "some authority to assess the sufficiency of the Government's evidence against the detainee"; "the authority to admit and consider relevant exculpatory evidence" that each petitioner may wish to introduce; and "the means [for petitioners] to supplement the record on review."  128 S. Ct. at 2270.  At the same time as it was

outlining these habeas essentials, *Boumediene* expressly *rejected* criminal-type proceedings, explaining that "[h]abeas corpus proceedings need not resemble a criminal trial, even when the detention is by executive order." *Id*. at 2269.   The *Hamdi* Court likewise expressly rejected the imposition of a "process [that] would approach the process that accompanies a criminal trial" including "quite extensive discovery of various military affairs." *Hamdi*, 542 U.S. at 528.

Despite these plain holdings, petitioners would discard the *Hamdi* framework in favor of a highly intrusive, elaborate, quasi-criminal process.  Such a course would be unprecedented and unworkable.  Petitioners argue that they are entitled to trial-type hearings to resolve *any* disputed issues of material fact, *see* Pet. Br. at 35-36, as if this were a full-blown criminal trial.  But this is a very different proceeding, and the Court must "presum[e]" the Government's "credible evidence" to be correct unless the petitioner puts forward his own "more persuasive evidence." *Hamdi*, 542 U.S. at 534.  This "prudent and incremental" approach is not governed by the Federal Rules of Civil or Criminal Procedure or the Federal Rules of Evidence, but is properly governed by the controlling Supreme Court opinion in *Hamdi*.  *Id*.  Moreover, petitioners envision a fulsome discovery process "more permissive" than that provided in modern statutory habeas cases, Pet. Br. at 30, and even broader than the discovery that accompanies criminal proceedings. *See id*. at 33 (seeking entry of an order requiring a search of all evidence in the Government's possession for exculpatory and impeaching material); *id*. at 29-30 (suggesting that some litigants may seek all Government Information relating to a petitioner); *id*. at 28 (asserting petitioners' entitlement to take depositions).  Petitioners seek imposition of a duty on the Government even broader than that in criminal cases:  to provide any and all exculpatory evidence – regardless of who knows about it – and, remarkably, to place upon the United States

military and intelligence community an affirmative "duty to learn of any favorable evidence known to the others acting on the government's behalf." *Id.* at 32-33 (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)). *Hamdi* expressly rejected this sort of broad, criminal discovery. 542 U.S. at 528. Petitioners also argue that while some hearsay may be permitted, the Court should employ a searching standard in evaluating whether it is permissible. Pet. Br. at 36-42. Again, this is contrary to *Hamdi*, which directed the lower courts to consider hearsay material as the best available evidence, and it gives no regard to the practical limitations imposed by the "rubble of war." 542 U.S. at 532-34. Finally, petitioners appear to suggest that live witness testimony through compulsory judicial process will be the norm and that the right to cross examine Government witnesses – including intelligence and military personnel – be afforded as a matter of course. *See* Pet. Br. at 36-42. In sum, petitioners propose that this Court adopt a quasi-criminal scheme far greater than even the procedures afforded in the statutory habeas provisions that Congress repealed as to these petitioners. The Court should not accept this invitation for at least three reasons.

First, as just pointed out, an expansive quasi-criminal procedural framework was expressly rejected by the *Hamdi* Court. The district court in that case had refused to rely on hearsay and "ordered the Government to turn over numerous materials for *in camera* review, including copies of all of Hamdi's statements and the notes taken from interviews with him that related to his reasons for going to Afghanistan and his activities therein; a list of all interrogators who had questioned Hamdi and their names and addresses; statements by members of the Northern Alliance regarding Hamdi's surrender and capture; a list of the dates and locations of his capture and subsequent detentions; and the names and titles of the United States Government

officials who made the determinations that Hamdi was an enemy combatant and that he should be moved to a naval brig." *See Hamdi*, 542 U.S. at 513-14.  That order in *Hamdi* is narrower than the limitless discovery sought by petitioners here.  But the Supreme Court reversed that order and others, describing the process contemplated by the district court as something that "would approach the process that accompanies a criminal trial" and as "anticipat[ing] quite extensive discovery of various military affairs."  *See Hamdi*, 542 U.S. at 528.  Thus, the Supreme Court squarely rejected this approach even for *citizen* detainees, holding that "the process apparently envisioned by the District Court below" does not "strike[] the proper constitutional balance when a United States citizen is detained in the United States as an enemy combatant."  *Id.* at 532.  Petitioners' proposals for evidentiary hearings, sweeping discovery into military and intelligence matters, and the like, demand an even more burdensome process than that rejected in *Hamdi* as overbroad even for an American citizen detainee.

Second, petitioners' framework seeks to remove from these proceedings any degree of deference to the Executive Branch in carrying out wartime operations.  While agreeing that petitioners are entitled to invoke constitutional habeas corpus, the Supreme Court also recognized that in "considering . . . the procedural . . . standards used to impose detention to prevent acts of terrorism, proper deference *must be accorded to the political branches*."  *Boumediene*, 128 S. Ct. at 2276 (emphasis added).  Petitioners' proposed framework, however, accords no deference to the political branches.  Indeed, petitioners contend that the government bears the burden of proving that petitioners are enemy combatants beyond a reasonable doubt, *see* Pet. Br. at 16-18, and that its decision to detain and supporting evidence are entitled to *no* presumption of validity.  *Id.* at 19-23.  This proposal is contrary not only to *Boumediene*'s

- 9 -

holding that deference is required, but also to *Hamdi*, which called for an evidentiary showing neither beyond a reasonable doubt nor by clear and convincing evidence, but rather by "credible evidence," and which expressly endorsed a presumption in favor of the Government's evidence in these circumstances. *Hamdi*, 542 U.S. at 534.

Third, petitioners' course is wholly unprecedented and will prove unworkable given the large number of habeas petitions at hand. Indeed, petitioners envision limited coordination and expect judges to decide issues of discovery in an ad hoc manner that will necessarily lead to inconsistent rulings on basic procedural points that all parties should have a strong interest in resolving consistently. Such a course can only further delay these cases rather than resolve them. The "prudent and incremental" approach is to require an orderly, manageable process whereby the Government first submits a factual return containing credible evidence that is presumed valid; the petitioner submits a traverse that must contain more persuasive evidence; and that any additional process, taken in incremental steps, is appropriate only if the weight of the evidence supports the petitioner. To be sure, petitioners will, as the Supreme Court emphasized in *Boumediene*, be able to participate in an adversarial process, have notice of the basis of their detention, and challenge that detention through supplementation of the record with *their* information. But the Court may properly limit its review as established by *Hamdi*. The Court should thus enter a case management order implementing the *Hamdi* framework, as proposed by the Government.

Petitioners suggest in a footnote, Pet. Br. at 23 n.9, that this Court should disregard the *Hamdi* framework because "only four Members of the Supreme Court joined the *Hamdi* plurality's procedural discussion." *Id*. But as we explained in our framework brief, Gov't Br. at

11, Justice Thomas's opinion, which would have dismissed the petition because, in his view, the Court had "no right to insist upon" "additional procedural protections," *Hamdi*, 542 U.S. at 579 (Thomas, J., dissenting), was the only other opinion to address "procedural protections" and provided an even *broader* rationale for deference to the Executive.  Thus, the controlling plurality provided the only opinion that can "be meaningfully regarded as 'narrower'" of the five Justices to address the issue.  *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991).  Justice Souter, on the other hand, declined to address "any questions of what process [Hamdi] may be due in litigating * * * under the habeas statute" (*Hamdi*, 542 U.S. at 553); his opinion therefore cannot be "regarded as 'narrower'" (*King*, 950 F.2d at 781) than the plurality opinion addressing habeas procedures.  Indeed, if anything, by leaving the scope of habeas procedures unaddressed, Justice Souter's opinion is also "broader" than the plurality's adoption of focused procedures.  More pragmatically, it makes no sense for this Court to ignore procedures outlined for this very situation by a plurality of four justices, especially when Justice Thomas would have imposed no such procedures at all.  Doing so would ignore the reasoned judgment of the *Hamdi* plurality and would cause chaos in the administration of these cases at the district court level.

## II.     PETITIONERS' SPECIFIC PROPOSALS ARE INCONSISTENT WITH THE *HAMDI* FRAMEWORK.

### A.     The *Hamdi* Burden-Shifting Approach Is Appropriate In These Cases and Should Be Implemented.

As we explained in our opening brief, this Court should enter an order that implements the *Hamdi* burden-shifting approach in assessing the facts that support the Executive Branch's decision to detain a petitioner as an enemy combatant.  Govt. Br. at 7-14.  Under that approach, the Government would first "put[] forth credible evidence that the habeas petitioner meets the

enemy-combatant criteria." *Hamdi*, 542 U.S. at 534.  The petitioner must then rebut that evidence "with more persuasive evidence." *Id.*  Only if that more persuasive showing is made will the Court then engage in additional factfinding.

### 1.    The Beyond a Reasonable Doubt and Clear and Convincing Evidence Standards Proposed by Petitioners Are Incorrect and Inconsistent with the *Hamdi* Burden-Shifting Approach.

Petitioners argue that military detention is appropriate only if the Government proves beyond a reasonable doubt or, at a minimum, by clear and convincing evidence, that the detainee is an enemy combatant.  *See* Pet. Br. 16-19.  Those standards do not apply here.

First, petitioners provide no authority for the revolutionary proposition that the Government must meet the exacting criminal law standard of proof beyond a reasonable doubt in civil habeas review of the military's decision to detain an alien enemy combatant abroad.  The Supreme Court has made clear that the reasonable doubt standard "historically has been reserved for criminal cases," and the Court has refused to require that standard in non-criminal cases even when an individual's liberty interest is at stake.  *See Addington v. Texas*, 441 U.S. 418, 427-428 (1979) (beyond a reasonable doubt standard is not required in civil commitment cases).

Second, petitioners' contention that the reasonable doubt standard should apply because of the weightiness of petitioners' liberty interest and the risk of error fails to consider the Government's countervailing interest in ensuring that those who have fought with the enemy during a war do not return to battle against the United States.  Moreover, the reasonable doubt standard is incompatible with the practical difficulties of determining who is an enemy combatant in a foreign war zone where collecting evidence according to criminal law standards is not possible.  Finally, petitioners' contention is inconsistent with *Hamdi*, which specifically

rejected applying quasi-criminal standards in this context.  542 U.S. at 532-33.

Petitioners contend that, even if the reasonable doubt standard does not apply, the government must prove its case by clear and convincing evidence.  *See* Pet. Br. at 18-19.  That contention is also inconsistent with the standard set forth in *Hamdi*.  Moreover, it is grossly at odds with a habeas court's traditional role in reviewing the factual basis for Executive detention decisions.  Indeed, petitioners urge that this Court apply substantive standards used in other detention contexts, but ignore *this* context, namely, how much evidence justifies a soldier's military decision to apprehend an apparent enemy in the field rather than allow him to potentially return to battle.  The answer to that question is far different from the question presented in any of the domestic proceedings cited by the petitioners, such as civil commitment or pre-trial detention, where the stakes are lower and the setting is more controlled.  In the wartime detention context, the consequences of even a single erroneous release can be catastrophic.  *See* Mintz, John, *Released Detainees Rejoining The Fight*, Washington Post (Oct. 22, 2004) ("One of the repatriated prisoners is still at large after taking leadership of a militant faction in Pakistan"; he had "maintained the fiction that he was an innocent Afghan tribesman" while at Guantanamo); Rubin, Alissa, *Former Guantanamo Detainee Tied to Attack*, New York Times (May 8, 2008) (reporting that "[a] former Kuwaiti detainee at the United States prison camp at Guantanamo Bay, Cuba, was one of the bombers in a string of deadly suicide attacks in the northern Iraqi city of Mosul last month").  Moreover, because of the difficulties inherent in gathering and presenting evidence from a war zone sufficient to meet the high standards of proof proposed by petitioners, a disproportionate risk of error would be transferred to our soldiers overseas.  Petitioners' proposal would strip the military of authority to detain enemies unless

their status as enemy combatants can be established by exacting standards created for domestic, peacetime criminal court proceedings, with the result that our soldiers' ability to protect themselves and our allies would inevitably be diminished, and the dangers they face would as a result be increased.

The Supreme Court in *Hamdi* set forth the standard that the Government must meet to satisfy a habeas Court's inquiry into the factual basis for detention – if the Government "put[s] forth *credible evidence* that the habeas petitioner meets the enemy-combatant criteria," it has met its factual burden. *Hamdi*, 542 U.S. at 534 (emphasis added). This standard is a far cry from the "beyond a reasonable doubt" and "clear and convincing evidence" standards proposed by petitioners. Because petitioners' proposed evidentiary standards are flatly inconsistent with *Hamdi*, and with the real-world exigencies of wartime conditions, they must be rejected.

### 2.    The Government's Evidence is Entitled to a Presumption of Validity.

Petitioners urge that no presumption in favor of the Government's evidence is appropriate. *See* Pet. Br. 19-27. But this contention is directly contrary to *Hamdi*, which expressly endorsed just such a presumption for a wartime detention in a context that is different only in that, there, *more* constitutional protections applied. Even in that context where the detainee, as a citizen, was afforded the full panoply of constitutional protections, the Court stated that "the Constitution would not be offended by a presumption in favor of the Government's evidence, so long as that presumption remained a rebuttable one and fair opportunity for rebuttal were provided." *Hamdi*, 542 U.S. at 534. That ability to rebut, the controlling plurality explained, "would sufficiently address the 'risk of an erroneous deprivation' of a detainee's liberty interest" and therefore satisfy the requirements of the Due Process Clause in protecting

the liberty interest of a United States citizen. *Id.* (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). *A fortiori* such a presumption is appropriate here, where the detainees are not citizens, constitutional protections are therefore lesser, and the habeas statute is inoperative except as constitutionally compelled.

Petitioners argue that a presumption is not warranted because the Court in *Boumediene* directed that there be plenary habeas review into the sufficiency of the Government's evidence. Pet. Br. at 19-20. But sufficiency review is deferential even in less sensitive contexts than here, *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979), and the fact that this Court will be conducting a review of the sufficiency of the Government's evidence to warrant detention is in no way inconsistent with according that evidence a presumption of validity. In those circumstances, if the Government's evidence is not more persuasively rebutted, the Court will simply perform the familiar task of determining whether that evidence, presumed true, is sufficient to support the conclusion that the detainee is an enemy combatant. *Cf. id.* (in reviewing sufficiency of evidence supporting criminal conviction, court "view[s] the evidence in the light most favorable to the prosecution"); *United States v. Pettiford*, 517 F.3d 584 (D.C. Cir. 2008) (applying sufficiency of evidence review in criminal case).

Petitioners also contend that *Boumediene* directly rejected a presumption in favor of the Government's evidence. Pet. Br. 20 (citing *Boumediene*, 128 S. Ct. at 2260, for the proposition that a central defect of the CSRT is that the it "accorded the Government's evidence a 'presumption of validity'"). This contention is plainly wrong. The Court nowhere addressed the *Hamdi* Court's holding that a presumption by the habeas court is appropriate. Instead, the Court was expressing concern over an administrative presumption that was all-but irrebuttable.

- 15 -

*Boumediene*, 128 S. Ct. at 2260.  There, the detainee's "ability to rebut the Government's evidence against him" was limited by the absence of counsel in CSRT proceedings, the rigorously enforced limits on what "reasonably available" evidence a detainee could request, *see* CSRT procedures, Enc. 1, § (G)(2), and the fact that he could submit no exculpatory evidence in subsequent court proceedings under the DTA.  *Boumediene*, 128 S. Ct. at 2260.  Here, on the other hand, the presumption is fully rebuttable by the petitioner who, with counsel, will have an adequate opportunity to present all of his own evidence.  In such circumstances, the *Hamdi* "presumption in favor of the Government's evidence" is entirely appropriate.  542 U.S. at 534.

The presumption is also appropriate given the nature of much of the evidence to be presented.  In many cases, evidence will be derived from intelligence that experts in the intelligence agencies and the military deem reliable for purposes of conducting military operations – which may involve the use of lethal force.  It is, thus, entirely appropriate to defer to their expertise with such information and their assessment.  Indeed, judges have "little or no background in the delicate business of intelligence gathering" and "[t]here is no reason . . . to have great confidence in the ability of judges to make" intelligence-related judgments correctly. *CIA v. Sims*, 471 U.S. 159, 176 (1985).

Petitioners also claim that a presumption is improper because, in their view, a CSRT determination is entitled to no deference because the CSRT represents factual determinations by "executive officials" rather than a "court of record."  Pet Br. at 20 & n.8.  Petitioners also cite various historical cases where courts "declined to defer" to a detention decision, but instead conducted de novo review.  *Id*. (citing *Ex Parte Bollman*, 8 U.S. 75, 125 (1807)).  But the issue of deference to a CSRT administrative determination (or the magistrate's determination in

*Bollman*) has no relevance to whether the Government's factual evidence is entitled to the presumption endorsed by *Hamdi*.  There were no CSRTs at the time *Hamdi* was decided, and *Hamdi* endorsed a presumption in favor of the government's evidence.  *Id.* at 534-35.  In any event, the Court in *Hamdi* also reasoned that deference is appropriate in these circumstances, as a Court must "giv[e] due regard to the Executive once it has put forth meaningful support for its conclusion that the detainee is in fact an enemy combatant."  *Id.* at 534.[1]

Petitioners also contend that the D.C. Circuit's decision in *Parhat v. Gates*, 532 F.3d 834 (D.C. Cir. 2008) precludes any presumption in favor of the Government's evidence.  Pet. Br. 21-23.  That contention misapprehends both the nature of the presumption endorsed by *Hamdi* and the holding of *Parhat*.

In *Parhat*, the D.C. Circuit considered whether the evidence before the CSRT was sufficient to support its determination that Parhat was an enemy combatant, according to the standards and procedures for CSRT's established by the Secretary of Defense.  532 F.3d at 841-42.  As the court acknowledged, among those standards and procedures is a "rebuttable presumption that the Government evidence is genuine and accurate."  *Id.* at 841 (internal

_____

[1]While it is outside the scope of this procedural briefing, it is well established that, on the merits, the military's detention decision must be afforded substantial deference.  *See id.*; *Hirota v. MacArthur*, 338 U.S. 197, 215 (1949) ("the capture and control of those who were responsible for the Pearl Harbor incident was a political question on which the President as Commander in Chief, and as spokesman for the nation in foreign affairs, had the final say"); *Aguayo v. Harvey*, 476 F.3d 971, 978-79 (D.C. Cir. 2007) (noting "the limited scope of review in military habeas cases" where "considerable deference" is appropriate); *Doe v. Sullivan*, 938 F.2d 1370, 1380 (D.C. Cir. 1991) ("The Supreme Court has cast the principle of judicial deference to the electoral branches in military matters in broad terms."); *Thomasson v. Perry*, 80 F.3d 915, 924-26 (4th Cir. 1996).  *Bollman*, a case involving a routine pre-trial detention judgment in a domestic criminal case, is of no relevance to the deference with which a civilian court must review the military's determination to detain an alien enemy combatant in wartime.

quotation marks omitted).  Although the court ultimately determined that the evidence was not

sufficient, that ruling in no way overruled, conflicted with, or even questioned the presumption

in favor of the Government's evidence that the court recognized.  Indeed, in announcing its

conclusion that the Government's hearsay evidence must contain sufficient information to permit

the court to assess its reliability, the court specifically stated that this conclusion was entirely

consistent with a rebuttable presumption in favor of the Government's evidence:

> [T]he factfinder must evaluate the raw evidence, finding it to be sufficiently
> reliable and sufficiently probative to demonstrate the truth of the asserted
> proposition with the requisite degree of certainty.  Both the obligation and the
> requirement likewise flow from the [Secretary of Defense's] establishment of a
> *rebuttable* presumption that the Government Evidence is genuine and accurate.
>  . . . .
> [I]n order to ensure, as the DTA requires, that the conclusion of the [CSRT] is
> supported by a preponderance of the evidence, allowing only a rebuttable
> presumption in favor of the Government's evidence, we must be able to assess the
> reliability of that evidence ourselves.

*Id*. at 847-48 (internal citations and quotation marks omitted) (emphasis in original).  Thus, far

from rejecting a rebuttable presumption in favor of the Government's evidence, the Court

specifically acknowledged and allowed that presumption, and tailored its review of the evidence

to ensure that the presumption was genuinely rebuttable.  Moreover, *Parhat* recognized such a

presumption in circumstances where the detainee had only a limited opportunity to rebut the

presumption with his own evidence.  *A fortiori*, the *Hamdi* presumption is appropriate in these

habeas cases where the detainee has a full opportunity – with the assistance of counsel – to rebut

the government's showing.  *See Boumediene*, 128 S. Ct. at 2260 (in addressing CSRT process,

expressing concern over petitioner's "ability to rebut the Government's evidence" that is

presumed valid).  Accordingly, petitioners' contention that *Parhat* somehow forecloses a

rebuttable presumption in favor of the Government's evidence is simply incorrect.

**B.      There is No Entitlement to Discovery in these Proceedings.**

Discovery into military affairs by those who have been determined to be our enemies poses unique risks to our nation's security.  As another district court judge recognized in a related context, the "discovery process alone risks aiding our enemies by affording them a mechanism to obtain what information they could about military affairs and disrupt command missions by wresting officials from the battlefield to answer compelled deposition and other discovery inquiries."  *In re Iraq and Afghanistan Detainees Litigation*, 479 F. Supp. 2d 85, 105 (D.D.C. 2007).

**1.      A Framework Order Precluding Discovery Should Be Entered.**

As we argued in our opening brief, petitioners are not entitled to discovery in these proceedings, and it should be precluded by court order.  Going back to the founding, there is no history of discovery in habeas cases (or in civil cases generally, where it was an innovation with the Federal Rules of Civil Procedure) that could possibly give rise to a right to discovery in constitutionally-based habeas proceedings.  Govt. Br. at 18-22.  The Court in *Boumediene* did not identify discovery as one of the essential elements of constitutional habeas.  Congress's repeal of statutory habeas jurisdiction, in conjunction with the fact that constitutionally-derived habeas corpus does not require discovery, is therefore fatal to the claim that discovery, much less discovery more extensive than that in statutory habeas, is appropriate in these proceedings.

The rules adopted by the Supreme Court to govern statutory habeas proceedings set a *ceiling*, not a floor, for proceeding under *constitutional* habeas.  And even if the habeas statute did apply, the Court's application of it should be guided by Congress's unmistakable intent to limit these habeas proceedings, as expressed in the DTA and MCA.  Accordingly, while

- 19 -

petitioners are entitled to provide their own evidence and version of events for this Court's consideration, any discovery they may be granted from the Government is a matter of Executive discretion rather than a constitutional entitlement.

Petitioners argue for *no framework limits* on discovery. *See* Pet. Br. at 31-32. That proposal cannot stand in light of the fact that no discovery is authorized in these proceedings. Petitioners' contention is also flatly incompatible with *Hamdi*'s application of the habeas statute. In support of their proposal for essentially unlimited discovery, petitioners cite the *Hamdi* decision's description of the discovery authorized by 28 U.S.C. § 2246. Pet. Br. at 28 (claiming that petitioners are "entitled to 'the taking of evidence in habeas proceedings by deposition, affidavit or interrogatories'") (quoting *Hamdi*, 542 U.S. at 525). But this citation lends no support to petitioners' request for unrestricted discovery. As we have explained, although *statutory* habeas was available in *Hamdi*, only *constitutional* habeas is available here. In any event, even the habeas statute does not *require* a court to permit discovery. Indeed, discovery is unquestionably the exception, not the norm, in statutory habeas cases in peacetime – and is all the less appropriate here given both the wartime context and Congress's clear intent to limit procedures to the constitutional minimum. Moreover, the *Hamdi* Court quoted the habeas statute on its way to *reversing* the district court's discovery order and *limiting* when additional factfinding would be appropriate, *i.e.*, only after a court concludes that a petitioner has successfully rebutted the Government's showing. And even then, as *Hamdi* directed, any such factfinding must be "prudent and incremental" and cannot be as broad as that available in criminal proceedings.

Petitioners also cite statutory habeas cases to argue that no framework order is

appropriate addressing discovery because the issue whether discovery is appropriate depends on "the facts of a particular case."  Pet. Br. at 29 (citing *Bracy v. Gramley*, 520 U.S. 899, 909 (1997)).  However, the proper guidance for constitutionally required procedures in habeas review of wartime detention of alien enemy combatants apprehended overseas is found in *Hamdi*, not in ordinary, domestic statutory habeas cases.  The *Hamdi* Court, after weighing the competing considerations, set forth a burden-shifting framework.  Under *Hamdi*, as we have explained, no discovery or other factfinding procedures are appropriate, even under the habeas statute and modern habeas practice, prior to a Court employing the burden-shifting framework.   Thus, the balance on discovery has already been struck even for statutory habeas cases of this type, and petitioners should not be allowed to evade the *Hamdi* framework by simply citing the general principle that the propriety of discovery depends on the facts and circumstances presented.[2]

Contrary to petitioners' claim, the "unique challenges . . . in gathering evidence" do not support authorizing discovery.  Pet. Br. at 31.  Those challenges arise from the wartime context of these cases, which calls emphatically for *limiting* or *precluding* discovery, as *Hamdi* itself reasoned.  542 U.S. at 533.  As *Hamdi* explained, "the exigencies of the circumstances may demand that, aside from these core elements, enemy-combatant proceedings may be tailored to alleviate their uncommon potential to burden the Executive at a time of ongoing military conflict."  *Id.*  The first "tailoring" performed by the Court was reversing the district court's broad discovery order and imposing the *Hamdi* burden-shifting framework.  The Court thus has

---

[2]Petitioners' request to have discovery that is "more permissive" than in statutory habeas cases (Pet. Br. at 30) should be rejected out of hand, given *Hamdi*.  So should petitioners' claim that the scope of discovery should be guided by the "full opportunity for discovery pursuant to state or federal rules of criminal procedure," Pet. Br. at 30, the precise type of discovery explicitly rejected in *Hamdi*.  542 U.S. at 528, 532.

already rejected petitioners' suggestion that "preliminary discovery" may be needed to "identify the evidence that is helpful to their case." Pet. Br. at 31.

As we explained in our opening brief, even if discovery were constitutionally required, it should occur only very rarely, and only after considering the factual return and traverse. Further, each specific discovery request must be approved by the district court, as is contemplated by rules for statutory habeas.[3] The discovery authorized must be incremental under *Hamdi* and *Boumediene*. *See Hamdi*, 542 U.S. at 539 (factfinding must be "both prudent and incremental"); *Boumediene*, 128 S. Ct. at 2262 ("habeas corpus procedures" should be "modified to address" "practical barriers"). Discovery that is not both extraordinarily rare and narrow is also antithetical to the expedited disposition of the numerous cases at issue.

To this end, even if it were ever permissible, a discovery request would have to be quite specific: It must "provide reasons for the request" and "include any proposed interrogatories and requests for admission, and must specify any requested documents." Habeas Rule 6(b). Even under modern habeas practice, when a petitioner makes such a request, it is his burden to show, based on "specific allegations," that "if the facts are fully developed" he may be "entitled to relief." *Bracy*, 520 U.S. at 908-09 (quotation marks omitted). The request must be appropriately "incremental": first, an expansion of the record pursuant to habeas Rule 7; limited interrogatories or requests for admission that may be answered by any appropriate Government personnel; document requests must be considered only after requests for admission, and must be narrow and focused on specific documents, not open-ended. Such concerns, and the exigencies of considering so many cases on an expedited basis, strongly militate against open-ended discovery

---

[3]Petitioners agree that discovery in habeas cases "requires leave of court." Pet. Br. at 29.

even if, in some rare cases, it may be constitutionally required.

**2.    The Government Will Voluntarily Submit Evidence Discovered by its Attorneys in Preparing the Factual Return that Materially Undermines the Information Presented in the Return to Support the Petitioner's Classification, But Cannot Properly Be Ordered to Provide Exculpatory Information.**

In our opening brief, we explained that, although not constitutionally required, the Government would submit any evidence that tends materially to undermine information presented in the return to support a petitioner's classification as an enemy combatant, which is encountered in developing the returns by the attorneys preparing them (including the Department of Justice attorneys assigned to the case and those Department of Defense attorneys working on the case with them).  This voluntary disclosure would make further discovery unnecessary and inappropriate, even if some discovery were constitutionally required.  The Government plans to provide this information even though the *Hamdi* plurality expressly *rejected* the imposition of a "process [that] would approach the process that accompanies a criminal trial" including criminal discovery that is delineated by a prosecutor's *Brady* obligation.  *See Hamdi*, 542 U.S. at 528; *see id*. at 532-33.

Petitioners seek a court order requiring the Government to provide all "'exculpatory' and 'impeaching' material in its possession."  Pet. Br. at 32.  This order cannot properly be imposed and, in any event, is overbroad and unduly burdensome.  It is difficult to overstate the burden such a requirement would impose—effectively forcing the military and intelligence agencies to redirect massive resources from protecting our national security to a limitless fishing expedition, in which they would be obligated to search countless databases for any shred of information that might arguably be considered "exculpatory" or "impeaching."  *See Bismullah v. Gates*, No. 06-

1198, Petition for Rehearing En Banc, at 8-10 (D.C. Cir., filed Sept. 7, 2007) (submitting declarations from the military and intelligence community explaining that a search for material on a detainee results in "tens of thousands, and in many cases hundreds of thousands, of documents . . . little of which has anything to do with the detainee or his enemy combatant status").

Further, such an order cannot properly be imposed for the reasons we explained in our opening brief. First, there is *no Brady* obligation in civil proceedings, including statutory habeas proceedings. It would be extraordinary to impose one outside of the criminal context, for the first time, in a case involving wartime detention where any disclosures could potentially threaten national security. *See In re Iraq and Afghanistan Detainees Lit.*, 479 F. Supp. 2d at 105. Second, the Government's voluntary undertaking, while narrower than *Brady*, still goes well beyond what *Hamdi* anticipated. *See* 542 U.S. at 528, 532. Third, there is no constitutionally-based requirement for discovery in habeas cases *at all*, much less a constitutionally-based requirement for *Brady* type disclosures (which after all was developed well after 1789). And, as we explained, the *Brady* obligation stems from the Fifth Amendment's due process obligations in domestic *criminal* cases; it has no application either to habeas cases or to these petitioners.

Petitioners' proposal is breathtakingly overbroad and burdensome. While the Government has no quarrel with providing evidence that is truly "exculpatory," in the sense that it tends materially to undermine information presented in the return to support the petitioner's classification as an enemy combatant, it should only provide that evidence when it is encountered in developing the returns by the attorneys preparing them. The Government cannot and should not be forced to conduct open-ended searches for such material. As we explained,

- 24 -

such a search is not constitutionally required because no *Brady* obligation attaches in the context

of these civil habeas proceedings in wartime.  Further, such a search is not relevant to the core

function of habeas identified by *Boumediene*, *i.e.*, giving a *petitioner* the opportunity to make his

own factual showing with his own evidence.   Such a search obligation is also contrary to

*Hamdi*, where the "quite extensive discovery" of criminal proceedings was rejected.  542 U.S. at

528.  Finally, such an approach would be extraordinarily burdensome in a time of ongoing war.

The United States military and intelligence agencies cannot be required to devote enormous

resources in a time of war to literally hundreds of worldwide evidentiary fishing expeditions.

Petitioners maintain that they will not "send the government on a 'fishing expedition.'"

Pet. Br. at 33.  But a search for information beyond what the attorneys preparing the returns

encounter in preparing them would be just that.  Additionally, petitioners contend that their

proposal will not be burdensome because the Government represented that it intended to review

government files to update returns.  Pet. Br. at 33.  That is true, but this review of government

files will be conducted by the attorneys who are preparing the returns.

Petitioners rely on *Brady* and other domestic criminal cases in insisting on mandatory

disclosure of all exculpatory and impeaching evidence.  *See* Pet. Br. at 32-33.  However, in

*Boumediene*, the Supreme Court did not consider, nor did it remotely suggest, that a mandatory

*Brady* obligation would be appropriate in civil habeas review of military detention of alien

enemy combatants abroad.  Instead, it rejected the procedures that accompany a "criminal trial,"

*id.* at 2269, and *Hamdi* expressly rejected criminal-type discovery procedures.  542 U.S. at 528,

532-33.  In sum, because there is no *Brady* obligation in this context, the Court cannot create one

and impose it on the Government.

- 25 -

III.    **IN THE NORMAL COURSE, THE FACTS SHOULD BE RESOLVED BASED UPON THE WRITTEN RECORD.**

A.    **Evidentiary Hearings Should Occur Only Rarely.**

As we explained in our opening brief, evidentiary hearings, if they occur at all, should occur only rarely.  First, there is no constitutional entitlement to such a hearing in these circumstances and there is nothing unusual about resolving habeas cases based upon the written submissions.  Second, neither *Hamdi* nor *Boumediene* suggested that a testimonial hearing would be appropriate or required in these circumstances.  Instead, *Hamdi* makes clear that evidentiary hearings with live testimony would be improper.  *See* 542 U.S. at 531-32 (soldiers should not be distracted from "the serious work of waging battle" to provide eyewitness accounts of actions that occurred half a world away).  Third, routine hearings would make it all but impossible to resolve these cases promptly.  Accordingly, an evidentiary hearing would be appropriate, if at all, only after the Court has reviewed the parties' written submissions and only once a court determines that, absent an evidentiary hearing, the weight of the evidence supports the habeas petitioner.  *See* Gov't Br. at 32-36.

Petitioners' proposal, on the other hand, calls for testimonial hearings to be routine – to be held in all cases where there is any disputed issue of material fact.  Such an approach does not square with the *Hamdi* burden-shifting framework, which requires that a petitioner first rebut the Government's credible evidence with "more persuasive evidence."  *Hamdi*, 542 U.S. at 534.  Thus, prior to *any* additional factfinding (and *well before* an evidentiary hearing is required), a petitioner must furnish evidence that is more persuasive than the Government's evidence – he cannot merely assert that there is a factual dispute or rest upon a general denial.  If the evidence submitted by a petitioner is *not* more persuasive, the court must resolve the facts in favor of the

Government's showing under *Hamdi without* holding an evidentiary hearing, and instead move on to any legal challenges raised by the petitioner. Petitioners' approach, by contrast, is even inconsistent with statutory habeas standards outside of the context of wartime detention. 28 U.S.C. § 2243 (court authorized by habeas statute to "summarily hear and determine the facts, and dispose of the matter as law and justice require").

**B.    The Confrontation Clause Does Not Apply and Compulsory Process Is Unavailable**

Petitioners urge that the baseline assumption will be a right to cross-examine witnesses and have the Court compel attendance of live witnesses at a hearing and order depositions for those outside of this jurisdiction under Federal Rule of Civil Procedure 45. *See* Pet. Br. at 37.[4] The Supreme Court has held that the discovery rules of the Federal Rules of Civil Procedure have only very limited application in ordinary statutory habeas cases. *Harris v. Nelson*, 394 U.S. 286, 292-98 (1969). And, of course, in light of that very limited applicability, *see* Fed. R. Civ. P. 81(a)(2), their application to constitutional habeas review of military detention of alien enemy combatants abroad is limited to that minimum of process required by the Constitution itself. Petitioners also assert that the baseline right to confrontation exists by relying principally upon cases where a *constitutional* right to confrontation applied due to the Sixth Amendment. That is clearly wrong because the Sixth Amendment simply does not apply outside of criminal cases. As to petitioners' assertion that the right of confrontation has been adopted outside of the

---

[4]The Rule 45 process itself is wholly inappropriate as a procedural framework mechanism. Under Rule 45, a petitioner could obtain a subpoena compelling a witness's presence, and perhaps documents, merely by issuing a subpoena and without any court approval. It would then place the burden on the Government to object. This is the exact opposite of the proper baseline even in statutory habeas proceedings, where court approval for any discovery request is required.

criminal context in some circumstances, *see* Pet. Br. at 37-38, those cases rest on the Fifth or

Fourteenth Amendment Due Process Clauses or on statutory rights. But as we have explained,

the Fifth Amendment has no application (or reduced application) to aliens held outside the

United States; and, in any event, our proposed procedures are consistent with the Fifth

Amendment as construed in *Hamdi*.

Aside from asking the Court to grant petitioners a general right to confrontation and to

compel the attendance of witnesses, petitioners posit that "particular considerations . . . are not

amenable to common preliminary decision." *Id*. at 38. To be sure, the precise factual situations

presented by the detainee cases may vary. But that is no reason not to set down the baseline

procedure that we have suggested, and permit petitioners to argue, based on specific reasons, that

it be modified. With regard to confrontation, it is plain, for the reasons we identified, that as a

general rule no such confrontation or cross examination rights exist. In addition, prior to arguing

that some exception should apply in a particular case (and consistent with a prudent and

incremental approach), other means should be employed prior to any confrontation or cross

examination. For example, interrogatories or depositions by written questions might be

appropriate, but only if a petitioner has exhausted other options.

Finally, as to the assertion that a petitioner should be permitted to argue that evidence be

excluded, *see* Pet. Br. at 38, the Court must reject this invitation. While petitioners should be

free to argue that particular evidence should be given less weight by the Court, a categorical

right to exclude evidence is wholly improper. In short, while exclusionary rules might be

appropriate for criminal proceedings, they do not apply to the conduct of a war. The

Government has a right under *Hamdi* to justify detention using "documentation regarding

battlefield detainees already . . . kept in the ordinary course of military affairs."  542 U.S. at 534-

35.  Nothing in *Hamdi* or any other authority compels the exclusion of information from the

factual return.

> **C.    Hearsay Is Admissible In These Proceedings.**

While resisting a uniform rule on the admission of hearsay, petitioners concede that it is

well within the district court's discretion to admit such evidence.  *See* Pet. Br. at 38-42; *see id.* at

35 ("proof may be offered by affidavit").  Thus, at most, petitioners' arguments suggest that, as

the Government has argued, the real issue is the weight that this Court give hearsay evidence,

rather than the mere admission of hearsay into evidence.

Petitioners' legal arguments on limiting hearsay are also not meritorious.  Even in

ordinary statutory habeas cases, the habeas statute specifically authorizes the taking of evidence

by affidavit as well as the submission of documentary evidence, *i.e.*, the sort of hearsay that will

form the core of the factual submissions in these cases.  28 U.S.C. §§ 2246-47.  Thus,

petitioners' insistence upon the application of limitations on hearsay in the Federal Rules of

Evidence must be rejected.  *See* Federal Rule of Evidence 1101(e) (Federal Rules of Evidence

apply in statutory habeas proceedings only "to the extent that matters of evidence are not

provided for in the statutes which govern procedure therein").  Moreover, because these

proceedings are brought under the Constitution rather than under § 2241, section 1101(e) does

not incorporate the evidence rules at all.  *Id.* (incorporating evidence rules only "[i]n the

following [listed] proceedings").

Petitioners' proposal to limit hearsay to that provided by the rules of evidence also cannot

be reconciled with *Hamdi*. The *Hamdi* Court stated plainly that hearsay may be relied upon in

these kinds of military detention habeas proceedings.  In *Hamdi*, 542 U.S. at 533-34, the

plurality addressed the competing interests at issue, recognizing that petitioners be afforded "a

fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker[,]"

*id.* at 533, and that this opportunity be "'appropriate to the nature of the case'"  *Id.* (quoting

*Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 542 (1985)).  But these habeas proceedings

must also, because of "the exigencies of the circumstances," "be tailored to alleviate their

uncommon potential to burden the Executive at a time of ongoing military conflict" and, thus

"[h]earsay, for example, may need to be accepted as the most reliable available evidence from

the Government in such a proceeding."  *Id.* at 533-34.

      Notwithstanding *Hamdi*'s plain language and its logic, petitioners insist that the Court

was "merely acknowledging that courts have discretion to admit affidavits under 28 U.S.C. §

2246 or other hearsay under Federal Rules of Evidence 803-807."  Pet. Br. at 39.  This cannot be

reconciled with the fundamental reasoning of *Hamdi*, which tailored proceedings to address the

unique burden of *these very circumstances*.  If the *Hamdi* plurality had intended that the Federal

Rules of Evidence were to apply to these proceedings, it would have mentioned the rules.

*Hamdi*, 542 U.S. at 533-34.  Indeed, petitioners' interpretation of *Hamdi* effectively reads out the

controlling plurality's understanding that these proceedings need to be "tailored" to account for

the Government's recognized interests and the plurality's acknowledgment that hearsay is not

only admissible, but may be "*the most reliable*" evidence.  The plurality's recognition that

hearsay may be the *most* reliable evidence establishes that it contemplated a framework outside

of the Federal Rules of Evidence.[5]

While styled as challenges to the admissibility of hearsay, petitioners' arguments, in fact, go to the issue of the weight the Court should grant such evidence. Thus, petitioners ask the Court to consider liberty interests and the alleged risk of error, Pet. Br. at 40, but these go to weighing the evidence, not whether it should be received. *See, e.g., Harter v. United States*, 871 F.2d 1140, 1143-44 (D.C. Cir. 1989). Likewise, petitioners propose that the Court, before accepting hearsay evidence from the Government, "must assess the reliability of the source and [] determine that the information presented is credible." Pet. Br. at 41.[6] Such a preliminary assessment is unnecessary, because the Court is fully capable of making these assessments *after*

_____

[5]Indeed, the common law exceptions to the hearsay rule arose from prudential considerations similar to those at issue here. The primary impetus behind the most common hearsay exceptions has been the judiciary's recognition that it is simply too burdensome or impractical to call a live witness to testify. For example, the exception for documents created by public officials, *see* Fed. R. Evid. 803(8), arose out of criteria at play in these habeas proceedings, the "presumption of a proper performance of official duty," the "great likelihood that a public official would have no memory at all respecting his action," and the "inconvenience of calling to the witness stand . . . government officers." *Wong Wing Foo v. McGrath*, 196 F.2d 120, 123 (9th Cir. 1952). The "uncommon potential to burden the Executive at a time of ongoing military conflict," *Hamdi*, 542 U.S. at 533 that these proceedings create would be greatly exacerbated by requiring live testimony from a person with first hand knowledge relating to the capture of a detainee outside of the United States. This provides a more compelling reason to provide for an exception to hearsay than to alleviate the burdens placed upon private businesses and public officials. *See id.* at 538-39 ("We anticipate that a District Court would proceed with the caution that we have indicated is necessary in this setting, engaging in a factfinding process that is both prudent and incremental.").

[6] Petitioners' reliance on *Parhat v. Gates*, 532 F.3d 834 (2008), is inapt. Whatever may be necessary to establish the reliability of evidence, *Parhat* had nothing to do with its admissibility, under the CSRT rules at issue there or (even more obviously) under the appropriate standards for wartime constitutional proceedings.

this evidence is accepted.[7]  In any event,  credibility determinations are a matter of weight not

admissibility.  *See, e.g.*, *United States v. Hamilton*, 334 F.3d 170, 186-87 (2d Cir. 2003)

(credibility of hearsay declarant "goes to the evidence's weight rather than to its admissibility").

Thus, petitioners' approach, which would exclude hearsay evidence absent a "specific, targeted

showing" of an undue burden on the Government, Pet. Br. at 41-42, is contrary to *Hamdi*, which

assumed that hearsay would be appropriate for the reasons that we have identified.

## IV.  PETITIONERS HAVE FAILED TO DEMONSTRATE THAT REQUIRING ADVANCE NOTICE OF TRANSFER IS EITHER WITHIN THE COURT'S JURISDICTION OR WARRANTED.

Petitioners argue that the Court has jurisdiction pursuant to the All Writs Act, 28 U.S.C.

§ 1651, to order advance notice of transfer and that such relief is needed to preserve the Court's

habeas jurisdiction or otherwise is warranted under the four-factor test for issuance of a

preliminary injunction.  *See* Pet. Br. at 6-12.  Petitioners are wrong as to both jurisdiction and the

appropriateness of an advance notice of transfer order.

As explained in our opening brief (*see* Gov't Br. at 43-45), the Court lacks jurisdiction to

enter an order requiring advance notice of transfer because § 7 of the MCA specifically

eliminates court jurisdiction to grant relief related to "any aspect of the . . . transfer" of aliens

detained as enemy combatants, 28 U.S.C. § 2241(e)(2), and that withdrawal of jurisdiction has

survived *Boumediene*.  As Judge Urbina recently held, "*Boumediene* . . . invalidate[s] only 28

U.S.C. § 2241(e)(1)" and does not impact section 2241(e)(2).  *In re Guantanamo Bay Detainee*

---

[7]  Because these issues are before judges, and not juries, the concern over hearsay is
clearly diminished regardless of these arguments.  *See Cobell v. Norton*, 224 F.R.D. 1, 5 (D.D.C.
2004) ("[i]n civil bench trials, . . . many experienced judges admit hearsay they deem reasonably
reliable and probative, either 'for what it is worth' or on some more explicit rejection of the
hearsay rule and its some 30 exceptions.").

*Litigation*, No. 08-442, — F. Supp. 2d —, 2008 WL 3155155, at * 3 (D.D.C. Aug. 7, 2008).

Furthermore, under *Munaf v. Geren*, 128 S. Ct. 2207 (2008), relief related to transfer and

relinquishment of United States' custody is beyond core habeas jurisdiction.  *See* Gov't Br. at

45-46.

      Accordingly, petitioners' appeal to the All Writs Act to support an advance notice of

transfer order is fruitless.  The Act provides that federal courts "may issue all writs necessary or

appropriate in aid of their respective jurisdictions," 28 U.S.C. § 1651(a), but the Act "confines

the authority to the issuance of process 'in aid of' the issuing court's jurisdiction" and "does not

enlarge that jurisdiction."  *Clinton v. Goldsmith*, 526 U.S. 529, 534-35 (1999); *see also In re

Tennant*, 359 F.3d 523, 527 (D.C. Cir. 2004) (quoting *id.*).  Thus, because the MCA deprives the

Court of jurisdiction related to "any aspect" of a transfer and, in addition, transfer-related relief

is not within the core of habeas, a notice of transfer order would not aid this Court's jurisdiction

and the All Writs Act therefore provides no authority to enter such an order.

      Moreover, because a transfer would achieve for the petitioner all the habeas relief to

which he is entitled, there is no justification to enjoin such a transfer pursuant to the Court's All

Writs Act authority.  *See Al-Anazi v. Bush*, 370 F. Supp. 2d 188, 196-198 (D.D.C. 2005) (Bates,

J.) ("Every habeas petition, including this one, is ultimately about obtaining release from

detention . . . and where, as here, the United States will relinquish custody of the detainee to the

home government there is nothing more the Court could provide to petitioners.") (citation

omitted).  As Judge Bates explained, "there is no justification for issuance of an injunction

pursuant to the All Writs Act when petitioners are obtaining the same relief through transfer that

they could hope to obtain through habeas."  *Al-Anazi*, 370 F. Supp. 2d at 196; *see Munaf*, 128 S.

Ct. at 2221.

Furthermore, petitioners have not demonstrated that the factors considered for issuance of a preliminary injunction support entry of such an order.  First, petitioners incorrectly assert that they need not show *any* likelihood of success or, at least, need only show "a fair ground for litigation."  Pet. Br. at 11.  A unanimous Supreme Court, however, held in *Munaf* that the likelihood of success showing is essential and requires more than a showing of "serious, substantial, [or] difficult" questions that give rise to "fair ground for litigation."  *See Munaf*, 128 S. Ct. at 2219.  Here, petitioners can show no likelihood of success in light of the Court's lack of jurisdiction to grant transfer-related relief,[8] the fact that a notice of transfer order would impinge upon separation-of-powers principles and the ability of the Executive Branch to speak with one voice in dealing with foreign nations, and the fact that the type of relief sought by petitioners – release from United States' custody only on conditions (advance notice) – is not appropriate.[9]

---

[8] *See Al-Anazi*, 370 F. Supp. 2d at 194 ("[T]he presence of a sound basis to challenge the legality of one's *detention* does not at all imply that there exists a sound basis to challenge the legality of one's *transfer*.  Put differently, the 'merits,' if you will, to be assessed for purposes of the present claim for preliminary injunctive relief, is petitioners' challenge to their *transfer* from Guantanamo, not to their *detention* at Guantanamo) (emphasis in original)

[9] Petitioners' attempt to find a legal basis for an advance notice order in FED. R. APP. P. 23, the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), and the Foreign Affairs Reform and Restructuring Act of 1998 ("FARR Act"), Pub. L. No. 105-277, § 2242, 112 Stat. 2681 (codified at 8 U.S.C. § 1231), also must fail. *See* Pet. Br. at 11.  The FARR Act, which implements the CAT, expressly provides that "nothing in this section shall be construed as providing any court jurisdiction to consider or review claims raised under the Convention [Against Torture] or this section, or any other determination made with respect to the application of the policy set forth in subsection (a) [prohibiting the return of persons when there are substantial grounds for believing they will be tortured], except as part of the review of a final order of removal pursuant to section 242 of the Immigration and Nationality Act (8 U.S.C. § 1252)."  *See* FARR Act § 2242(d).  These cases do not involve a final order of removal under § 242 of the Immigration and Nationality Act, and neither the FARR Act nor the regulations thereunder (8 C.F.R. §§ 1208.16-1208.18) create jurisdiction to review any CAT

*See* Gov't Br. at 45-48.

Second, petitioners have not made a showing of irreparable harm to warrant a notice of transfer order. Here, the record clearly demonstrates that it is United States policy not to repatriate or transfer a detainee to a country when the United States believes that it is more likely than not that the individual will be tortured. *See* Williamson Decl. ¶¶ 2-8; Hodgkinson Decl. ¶¶ 3-7 *see Munaf*, 128 S. Ct. at 2226 (noting the Solicitor General's statement "that it is the policy of the United States *not* to transfer an individual in circumstances where torture is likely to result"). This policy is implemented by expert Executive agencies through a process that contains several levels of precautions and safeguards. *See* Williamson Decl. ¶¶ 2-8; Hodgkinson Decl. ¶¶ 3-7. And as the Supreme Court concluded in *Munaf*, it is inappropriate for the judiciary to "second-guess" implementation of that policy. 128 S. Ct. at 2226; *id.* at 2225 ("Even with respect to claims that detainees would be denied constitutional rights if transferred, we have

---

claims in the circumstances presented here. *See Mironescu v. Costner*, 480 F.3d 664, 673-74 (4th Cir. 2007), *cert. dismissed*, 128 S. Ct. 976 (2008); *Al-Anazi*, 370 F. Supp. 2d at 194; *see also Munaf*, 128 S. Ct. at 2226 n.6 (dictum); 8 U.S.C. § 1252(a)(4) (CAT claims are not cognizable in a habeas petition). Further, the Court of Appeals has held that FED. R. APP. P. 23 provides no basis for relief related to relinquishment of United States custody of aliens held as enemy combatants. *See Qassim v. Bush*, 466 F.3d 1073, 1078 (D. C. Cir. 2006). Moreover, Article 3 of the CAT does not apply extraterritorially. The record of proceedings related to United States ratification of the CAT demonstrates that at the time of ratification, the United States did not interpret Article 3 to impose obligations with respect to individuals located outside of U.S. territory. When the Secretary of State transmitted the CAT to the Senate for its advice and consent to ratification, the State Department's analysis of Article 3 indicates that it understood that the non-refoulement obligations it was undertaking related to removal or extradition from the United States, and not to extraterritorial action by United States officials. *See* Message from the President of the United States Transmitting the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Adopted by Unanimous Agreement of the United Nations General Assembly on December 10, 1984, and Signed by the United States on April 18, 1988, Treaty Doc. 100-20, at 6. This analysis was subsequently adopted by the Senate in its report recommending that the Senate provide its advice and consent to ratification of the CAT. *See* S. Exec. Rep. No. 101-30 at 16-17.

recognized that it is for the political branches, not the judiciary, to assess practices in foreign countries and to determine national policy in light of those assessments.").[10]   Moreover, the Supreme Court's conclusion in *Munaf* is consistent with the Rule of Non-Inquiry developed in the extradition context.  As Judge Bates explained, "[c]ounseling even further against judicial interference in the transfer of detainees to other countries is a well-established line of cases in the extradition context holding that courts will not conduct an inquiry into 'the procedures or treatment which await a surrendered fugitive in the requesting country.'" *Al-Anazi*, 370 F. Supp. 2d at 194; *see United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cirt. 1997).

Third, petitioners' claim that an advance notice of transfer order would result in no discernable harm or burden to the government or the public interest overlooks the very real harms to separation-of-powers concerns and to the Government's ability to speak with one voice on behalf of the Nation in discussing release or transfers with foreign nations.  *See Munaf*, 128 S. Ct. at 2226; *see also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 381 (2000) (expressing disapproval of acts that "compromise the very capacity of the President to speak for the nation with one voice in dealing with other governments").   An advance notice of transfer requirement would make the results of diplomatic dialogue between the Executive Branch and a foreign government regarding transfers inherently contingent upon the effective acquiescence of the Judiciary.  These harms weigh heavily against entry of a preliminary injunction, even if the Court had jurisdiction to provide such relief, which it does not.

---

[10] Indeed, the Court reached this conclusion in *Munaf*, even though the U.S. had concerns about torture among "some sectors of the Iraqi government," because the Court deferred to the State Department's conclusion that the specific department of the Iraqi government to which transfer would be made and the specific facilities in which petitioner would be held by that department were not likely to result in the petitioner being tortured.  *See* 128 S. Ct. at 2226.

**V.     PETITIONERS HAVE PROVIDED NO REASON WHY THIS COURT SHOULD NOT, FOR COMPELLING PRACTICAL REASONS, PRIORITIZE CASES BROUGHT BY DETAINEES NOT APPROVED FOR RELEASE OR TRANSFER.**

We explained in our framework brief why practical reasons strongly militated in favor of prioritizing cases where petitioners have not been approved for transfer or release. For those who have been approved for release or transfer, the Department of Defense is already trying to provide the petitioner with the relief he is seeking through habeas – a release from United States custody. *See Al-Anazi*, 370 F. Supp. 2d at 196. Thus, habeas proceedings, even if successful, are likely to be of limited practical significance – either way, the Government will be actively trying to effectuate the transfer of the petitioner out of United States custody. If those efforts are successful, the cases will be moot.

At the same time, the Court cannot hear every case at the same time – it must impose some method of sequencing. Because of the foregoing considerations, it makes practical sense to start with the cases that have no chance of being mooted and where the parties are not both attempting to achieve the same result prior to litigation.

## CONCLUSION

For the foregoing reasons and the reasons provided in the Government's opening brief, we respectfully request that the Court enter the Government's proposed case management order.[11]

---

[11]Petitioners' counsel has moved for leave to file a thirty page brief as the "response[]" brief called for in the Court's order. Briefing and Scheduling Order at 4 (July 31, 2008). Because the Local Rules of this Court do not expressly provide a page limit for a "response," but because petitioners' and respondents' responses appear to be in the nature of oppositions to motions for which Rule 7(e) provides a forty-five page limit, petitioner's motion appears unnecessary. Should the Court consider the reponses to be in the nature of replies as to which a twenty-five page limit applies, respondents respectfully request leave to file this document as an

Dated: August 19, 2008

Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

JOHN C. O'QUINN
Deputy Assistant Attorney General


  /s/ August E. Flentje

JOSEPH H. HUNT (D.C. Bar No. 431134)
VINCENT M. GARVEY (D.C. Bar No. 127191)
JUDRY L. SUBAR (D.C. Bar No. 347518)
TERRY M. HENRY
AUGUST E. FLENTJE
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel:  (202) 514-1278
Fax:  (202) 514-7964
Attorneys for Respondents

---

overlength brief.